All right, Mr. Brueggemann, we'll hear from you first. Thank you, Your Honor. May it please the Court. Your Honor, exceptions to bankruptcy discharges are construed narrowly in favor of the debtor, including debts arising from alleged actual fraud, as under the statute that's at issue in this case, 11 U.S.C. 523A2A. While in 2016 the United States Supreme Court in the Husky International decision opened the door for a creditor to seek a non-discharge claim against a transferee of assets who participates in a fraudulent transfer scheme, the undisputed facts and stipulated facts of this case show that Mrs. Wigley did the exact opposite of participating in a fraudulent transfer scheme. Upon receiving the transfers and holding them and preserving them, eventually she began paying them to the creditors of the transferor, Michael Wigley. In fact, within a year of receiving the transfers, she paid a substantial sum to Lariat's co-plaintiffs in the fraudulent transfer action, who were Home Federal Savings Bank and Bremer Bank. The payments, the amounts, $675,000 paid to Home Federal and Bremer in the year 2012 alone. These are all stipulated facts. The non-dischargeability sanction in this case imposed by the bankruptcy court and affirmed by the BAP draws no behavioral distinction between Mrs. Wigley in her efforts to ultimately pay the creditors in this case versus if she had just simply concealed or spent the funds. The bankruptcy court and BAP erred as a matter of law in not giving her credit in finding the pathway to redemption here, which the case law we cite shows exists in 523 cases and the narrow construction standard. Mrs. Wigley did not participate in a fraudulent transfer scheme warranting the severe sanction of non-dischargeability to creditor Lariat's claim. In addition, Lariat has recovered substantially from both Mr. and Mrs. Wigley of its commercial lease guarantee claim and should not be entitled to receive any further remedy, including the non-discharge. As you know, this case was before this court a year ago on the issue of whether or not the landlord cap under Bankruptcy Code 502B6 applied to Lariat's claim. And further back, this case, Lariat's claim against Mrs. Wigley derives from its commercial lease guarantee claim against Mr. Wigley, which Mr. Wigley ultimately reduced and paid from $2.2 million to $637,000 in his Chapter 11 bankruptcy reorganization case. Upon Lariat continuing its collection efforts on its fraudulent transfer claim against Mrs. Wigley, she filed Chapter 11 and successfully applied the landlord cap in this case, which this court affirmed last year, reducing her liability from approximately $1 million to $330,000 initially, and then she paid a little more interest to get that up to $360,000. In any event, she paid Lariat's entire allowed claim in this case. And to date, Lariat stands before this court having received nearly a million dollars from the Wigleys and has recovered upon two allowed claims in two separate Chapter 11 reorganization plans and has recovered everything it's permitted to recover under the code. When Lariat argued against the landlord cap a year ago, it said because Mrs. Wigley was the recipient of a fraudulent transfer, she should not benefit from the landlord cap because of her fraud. It wasn't simply just a lease situation with her. The court, however, rejected that argument and specifically stated in its opinion from last year, quote, Lariat as lessor should not avoid the cap and receive a windfall because it is filing a claim based on a fraudulent transfer judgment from a breach of a lease instead of a claim based just on breach. This court's characterization of a windfall as to Lariat's disallowed claim is extremely pertinent here because really what we are continuing to fight about in this case is the non-dischargeability and the remaining recovery of that windfall portion. Mrs. Wigley has paid the allowed amount and it's really the remaining $1 million that Lariat's seeking roughly to recover on the disallowed amount, which includes quite a bit of interest as this case has winding through the courts over the years. Transitioning again right into the argument I hear, Your Honor, about 502B6 and how the bankruptcy court in BAP did not properly consider the impact of that landlord cap in this related non-dischargeability action. The bankruptcy court citing one case simply said, well, a claim can be both disallowed and non-dischargeable, so I'm not divested of jurisdiction to make that non-dischargeability ruling, and so I will treat the two kind of separately. Cap it, but then rule it non-dischargeable. However, these results are inconsistent and out of line with Congress's intent with respect to the treatment of claims for landlords. The Congress, while the question of whether a post payment the bankruptcy court had any jurisdiction to continue entering a non-dischargeability judgment on only a disallowed claim, Congress has nonetheless put its thumb on the scale in the relations between landlords, its tenants, and as this court affirmed, any other collection targets between the landlord, its tenants, and guarantors. The existence of the bankruptcy court and the BAP in rejecting the non-dischargeable claim... And counsel, Judge Comis here, what's your best case on that point that you just made, that it should have weighed heavily? Just the... I think there's a 1944 case in which the Supreme Court, I think it's old in realty, describes the purpose of the landlord cap as a remedy to limit landlords' actual recovery. Does that address the issue? Did that case address non-dischargeability though? No, your honor, there has never been a case that I'm aware of where these issues of non-dischargeability and disallowance are conflating as they are here. My point in referencing that 1944 Supreme Court case is that it re-emphasized the substance of that landlord cap, that it's not just a mere technicality to make sure that all creditors share equally. It is a hard cap and ultimately is intended for the benefit of the debtor to gain a fresh start from what that Supreme Court case said is often an overstated landlord claim that usually has a significant allowance for future rents and may also... A landlord will have a And this is our final attempt to gain relief from that using the tools that the bankruptcy court in Congress has given us. Your honor, it violates the narrow construction standard of 523 to ultimately be entering a non-dischargeability judgment, the purpose of which is only going to accrue to a further windfall. And I'd also like to point out that, interestingly, Lariat, had this transfer never occurred, Lariat would have only been entitled to recover one capped claim and that's in Mr. Wigley's case. So their recovery would have been approximately $637,000. With the transfer claim, it actually improved Lariat's overall recovery because it was allowed to then recover a second capped claim in this case, raising its recovery to nearly a million dollars or approximately a million dollars. And I raise this point, your honor, because traditionally when we've looked at fraud claims under section 523, we look to how the fraudulent conduct actually injured a creditor. That's always been an element under 523, proximate causation of injury. And it's very remarkable, unlikely, and could not have been within the contemplation of the Supreme Court when it was outlining this decision in Husky, that a fraudulent transfer situation with the confluence of a capped claim could actually result in improvement to a creditor's position. And again, running the facts of this case through a narrow construction standard, which of course isn't dispensed with in any regard under the Husky decision, should render the non-dischargeable judgment unreasonable, inequitable, and reversible here. Addressing a few points, this from Husky, I really haven't discussed Husky in any great detail because some of these other unique facts in this case, such as Mrs. Wigley ultimately coming forward and returning these transfers to the creditors who were asking for them, and the existence of the cap on Lariat's recovery, were of course far from any of the facts in the Husky decision. But some other comments on Husky, it set the standard that if a transferee receives transfers from a fraudulent transfer scheme, intentionally participates, and that transferee can lose his or her discharge. However, Husky was a case involving a debtor who owned a company and completely stripped and drained the company of all assets to pay its debts. The principal then, while paying nothing to his creditors, filed a Chapter 7 to attempt to evade all liability for those debts. That situation is remarkably different than what we have here because the record shows that Michael Wigley, as the transfer and the so-called purveyor of the fraudulent transfer scheme, did not actually leave his creditors high and dry. And in fact, he paid creditors along the way, even before filing a Chapter 11 bankruptcy, facilitating these settlements with Home Federal and Bremer, and ultimately paying Lariat's capped claim in a Chapter 11 case. Your Honor, I'm approaching my rebuttal time and I think I'd like to reserve the balance of time for rebuttal on this argument. You may. Thank you for your argument. Thank you. Mr. Warner, we'll hear from you. Thank you, Judge Colleton. It may have pleased the Court. I'm George Warner and I represent Lariat Companies, Inc. in these proceedings today. Lariat believes that Judge Fisher's original decision, as upheld by the Baps-Later decision, are both correct in all respects and we respectfully request that this Court, in turn, uphold the lower court's decisions. I'd like to maybe throw my notes to the wind and address head-on a point my colleague just made, which is that but for the fraudulent transfer from Mr. Wigley to Ms. Wigley, Lariat would only have been permitted to collect one capped claim from Michael Wigley to his spouse, Barbara Wigley. And but for that actually fraudulent conduct, we would not be here yet today. So I find it somewhat remarkable and an excellent point of advocacy to try to twist that to the debtor's benefit and say, but for our wrongful conduct in these circumstances, you wouldn't be able to pursue the wife. Well, that's absolutely right. We wouldn't be able to pursue the wife. But those are not the facts that are present in this case and those are not the facts that bring us here today. Rather, the facts are really what drive this case. It's an extremely fact-intensive case that, as this Court is well aware, has been litigated now for over a decade and the facts are simply glaringly in Lariat's favor. Judge Fisher, I think being familiar with the history of the parties, wrote what I believe would be considered a bulletproof, 19-page, extremely meticulous order in which he detailed 74 separate and distinct findings of fact, setting forth exactly the predicate factual basis for finding that Mr. Michael Wigley and Ms. Barbara Wigley had actively, deliberately, intentionally participated in a scheme to transfer assets, to keep them out of the reach of creditors, and then later to use them to their benefit in whichever way they saw fit. And when faced with those facts and when applying the Husky decision, the relatively recent 2016 decision of the Supreme Court, Judge Wigley found in his opinion states as much that he had no option but to find that the state court fraudulent transfer judgment against Ms. Barbara Wigley was a non-dischargeable judgment. And that's because it's based in fraud, it springs from fraud, it reeks of fraud, and that odor pervades these entire proceedings. Some of the facts that Judge Fisher found, and I find it somewhat remarkable when the debtor says that Judge Fisher selectively considered facts, I think the record shows anything but that. Judge Fisher exhaustively considered all of the facts in this case, and when viewing them in their totality, clearly found the fraudulent transfer scheme envisioned by Husky. There was a transfer to an insider, this is an intra-spousal transfer between husband and wife. It was done contemporaneously with many lawsuits pending against the debtor. And although they would not admit this originally at trial, as Judge Fisher points out in his order, upon impeachment, Ms. Barbara Wigley admits as much that she knew of the impending litigation and was a knowing participant in the transaction with the knowledge about these cases pending. There is no value given for the transfer, and to their credit, the Wigleys tried to manufacture any possible explanation but fraud to cover up their conduct, but the court would hear nothing of it. There was this intra-spousal ledger claim where apparently there was some sort of undocumented loan between the spouses and that was given no credence. There was also the theory that these transfers were done for estate planning purposes, but that fell apart at trial, of course, because if the transfers were done for estate planning purposes, then when Ms. Wigley uses that money to pay her husband's creditors, the estate planning purpose is completely undone, so that makes no sense. And then, in addition, there's the aspect of retaining possession, and that's perhaps most striking with the bank account. And again, to pull the focus out to the larger picture, this case involves two extraordinarily sophisticated and wealthy individuals. Mr. Wigley himself has an MBA from Harvard. He's a multimillionaire with years of entrepreneurial experience. His wife, Ms. Wigley, is not unsophisticated in these business matters and, in fact, testifies that she's involved in the finances and the business finances to some degree, and her own solvency is quite remarkable. When she files, I believe her assets are nearing 2 or 2.5 million. On the filing, however, Mr. Wigley has no bank account in his name, none whatsoever. He's taken his name off the only existing bank account he had, and he's now using it as his own, but it's only titled in Barbara's name. And at trial, the testimony is quite striking as to Mr. Wigley writing out checks from Ms. Wigley's signature, Mr. Wigley accessing the account at will, depositing into the account, taking out of the account. He's in total complete dominion and control over these assets he's put in the name of his wife, and he's done that solely to shield them from the claims of his creditors. Likewise, the much larger asset, these spell funds, are unique in that they are really the only non-exempt assets that he, Mr. Wigley, cannot control. In other words, in order to foil Lariat's collection efforts, he has to put his bank account in his wife's name. He can then deal with his various business holdings and ensure that they're protected, but he can't protect the spell assets because of the unique nature of these assets. He has to put them in Ms. Wigley's name in order to protect them, and of course, that's what he does. Later on, however, he shows again that he has complete dominion and control over the spell funds when he directs Barbara to use them to pay Bremer and Home Federal. So although he's given these assets to Barbara, he tells her what to do with them, when to do it, how to do it, how much to pay, whom to pay it to, and he makes deals with those two creditors he doesn't bear a grudge against, Bremer and Home Federal, because he's successfully secreted or hidden those assets, protected those assets from Lariat until such time as he wants to use them to his benefit. And so again, this is kind of turning the tables here. The debtor, Ms. Wigley, would like to show that the ultimate use of the assets because they go to pay these other creditors is some feather in her cap showing good behavior, just as the debtor would like to show that Lariat is somehow obtaining a windfall by being able to pursue her because of fraudulent transfer judgment, and neither is the case. Based on these facts, Judge Fisher then moves to the legal analysis, and likewise, the lower court is simply meticulous in analyzing all of the relevant authorities and producing a very sound opinion that we believe is just simply incapable of attack. The points of error that Ms. Wigley raises simply have no merit, and first of all, Judge Kobus, I think you hit on this 502B question and the interplay between non-dischargeability and the allowed claim. 502B-6 is a bankruptcy mechanism or procedure to ensure that a landlord doesn't grab the lion's share of a debtor's estate. It caps a landlord's claim to ensure there's debtor's bankruptcy estate to pay all other creditors fairly. The fear being, of course, that most businesses rent their property, most businesses have a landlord, and that landlord is going to have a huge future rent claim. So if you let a landlord put a claim for all their future rents in connection with a debtor's bankruptcy, they'd sweep that bankruptcy. There'd be nothing left to pay anyone else. So 502B-6 exists solely to ensure that all the creditors can share somewhat equally in whatever assets the debtor may have, but we're unable to find any existing authority. I don't think there is any existing authority that says a 502B-6 claim, if paid, would somehow eliminate or extinguish a creditor's right to bring a non-dischargeability action. That's distinctly different. Non-dischargeability is governed by a different section of the code, which states that if a debtor engages in actual fraud, you can then litigate that claim in the bankruptcy court and seek to have your judgment, or whatever the claim may be, taken out of the bankruptcy context so that you can pursue your state court rights to collect it. In other words, it's not considered to be eliminated by virtue of wrongful conduct of the debtor. And that's exactly what we have here. Judge Fischer found that Lariat's state court fraudulent transfer judgment was based on this actually fraudulent conduct, and therefore it would survive Ms. Wigley's bankruptcy. Now, Ms. Wigley's bankruptcy is completed. Her plan was consummated. She made the plan payment and all the rest. So Lariat's bankruptcy pursuit of Ms. Wigley has nothing to do with the bankruptcy estate or whatever distributions or payments she made in connection with her Chapter 11. It's completely outside of that. And so the 502b6 cap or that argument simply just doesn't work here. How much is Lariat trying to collect now on the state court judgment? Well, the perhaps cheeky answer to that, Judge Colleton, is everything we can. But that's not helpful. And a more specific answer is that's actually playing out currently in Minnesota state court. There is a motion currently pending before a state court judge wherein Ms. Wigley and her counsel have argued that the amount of the state court judgment should be reduced or even eliminated by virtue of Mr. Wigley's payment as well as some circumstances. Lariat, of course, opposes that. And we are attempting to collect what we believe to be the balance of the state court judgment and what we would calculate as being the state court judgment of originally $788,000 less the payment made by Ms. Wigley, which was roughly $350,000, plus, of course, the intervening interest. And interest plays a large component here. So in rough numbers, depending on what happens in the state court proceedings, Lariat may stand to collect another $600,000 or $700,000. But thus far, Lariat's been completely foiled in all collection efforts by Mr. Wigley or Ms. Wigley, save and except the bankruptcy 502B6 limited cap amounts. And by that, I mean Lariat was completely unable to collect anything from Mr. Wigley in the state court proceedings on the eve of obtaining a state court order. Mr. Wigley filed his Chapter 11, which stopped all collection efforts. We then got our landlord limited cap from Mr. Wigley. The state court litigation proceeded against Ms. Wigley. We never collected anything against Ms. Wigley. On the eve of being able to collect against Ms. Wigley, she files a Chapter 11. We receive her landlord capped claim. And then following her Chapter 11, the state court and the finding in the adversary proceeding that her debt is non-dischargeable, state court collections begin again. We were able to garnish one bank account somewhat recently, and I realize this isn't in the record. That's okay, we don't need all that. Remind me how much of the capped 502B6 amounts? Mr. Wigley paid in rough numbers $650,000 in his case. Ms. Wigley paid in very rough numbers, perhaps $350,000 or $60,000 in her case. Okay, thank you. I have to note, however, the significance of that is to Lariat, the original state court judgment against Mr. Wigley was in the principal amount of roughly $2.2 million. With interest, that claim today is, and I haven't calculated it recently, but it's well over three. So to date, although Lariat's roughly $900,000 or perhaps a million, that's only a third of what its state court judgment against Mr. Wigley ultimately was. And even if Lariat is successful in collecting the non-dischargeable judgment from Ms. Wigley, whatever the state court determines that may be, we're still likely to fall at least a million or more short of collecting what ultimately the state court ruled that we were entitled to. I see my time is drawing to an end, your honors. So very simply, Lariat believes that the underlying or lower court's decisions were well warranted with findings both as to the Wigley's committed actual fraud in orchestrating these various transfers, we'd ask that the decisions be upheld. All right, thank you for your time. Thank you, your honor. I just want to highlight again that the lower courts, while they conducted a very thorough examination under state law, fraudulent transfer statutes, they missed the big point items and the very unique items in this case. And ultimately, this case is not about Mr. Wigley's conduct or the badges of fraud as applied to Mr. Wigley's conduct. And it's her remaining liability and her remaining time that would be spent with Lariat as collector because Mr. Wigley himself received a discharge. And so the outcome we have here is drastically draconian in light of the fact of Lariat's recoveries to date, the fact that its original 3.2 judgment that Mr. Warner is still apparently not happy about not collecting was almost 90% future rent. And that's exactly what is supposed to be capped under the bankruptcy code. And that cap was applied because Mr. Wigley was deemed to be a good faith filer and because Mrs. Wigley was deemed to be a good faith filer. And at its core, this dischargeability judgment is inconsistent with both those outcomes. And it leaves someone like Mrs. Wigley who received these assets and ultimately made the right choice with them in terms of not hiding them, not using them for her own benefit, made the right decision to do what with these assets. She's still being penalized under this judgment as if she had simply frittered all of the money away. And that is not an outcome that's consistent with applying exceptions to discharge narrowly in favor of the debtor to facilitate their fresh start. And with that, Your Honor, we request that you reverse the judgment of non-dischargeability entered by the bankruptcy court and affirmed by the BAP. Thank you. Very well. Thank you for your argument. Thank you to both counsel. The case is submitted and the court will file an opinion in due course. Thank you.